UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x

CHARLES R. MCNAMARA,                  :

                    Plaintiff,        :        **OPINION**

          - against -                 :        05 Civ. 7804 (DC)

TOURNEAU, INC.,                       :

                    Defendant.        :

- - - - - - - - - - - - - - - - -x

```
  USDC SDNY
  DOCUMENT
  ELECTRONICALLY FILED
  DOC #:
  DATE FILED: 8/1/07
```

**APPEARANCES:**   CHARLES R. MCNAMARA
                   Plaintiff <u>Pro Se</u>
                   82-30 218th Street
                   Queens Village, New York  11427

                   PROSKAUER ROSE LLP
                   Attorneys for Defendant
                   By: Steven D. Hurd, Esq.
                   1585 Broadway
                   New York, New York  10036-8299

**CHIN, D.J.**

          In this employment case, <u>pro se</u> plaintiff Charles

McNamara alleges that his former employer, defendant Tourneau,

Inc. ("Tourneau"), discriminated against him because of his

alleged disability and retaliated against him for complaining of

discrimination to the New York City Human Rights Commission (the

"Commission"). Tourneau moves for summary judgment dismissing

the complaint. For the reasons that follow, the motion is

granted.

                         **BACKGROUND**

**A.   The Facts**

          For purposes of this motion, the facts are drawn

principally from McNamara's own deposition and are construed in

the light most favorable to him, as the party opposing summary judgment.

### 1.    Tourneau Hires McNamara

In December 2003, Tourneau, a watch retailer, hired McNamara as a sales associate at its 57th Street store in Manhattan.  (Pl. Dep. 8, 12, 36; Charge, Attach. ¶ 2).[1]  His duties included taking watches out of the safes and setting them up in their display cases in the morning; greeting potential customers and showing and selling them watches once the store opened; and removing the watches and returning them to the safes when the store closed at the end of the day.  (Pl. Dep. 38, 40). Throughout his employment, until he suffered the injury that led to this case, McNamara performed his duties well.  (Charge, Attach. ¶ 3).

McNamara worked five days a week, from approximately 9 a.m. to 7 p.m.  The nature of the job required him to be at the store, on his feet virtually all day.  (Pl. Dep. 38-41).

### 2.    McNamara Is Imjured

On June 3, 2004, as he was on his way to work, McNamara fell a few blocks from his home.  He tripped on a "very steep

---

[1]    References are as follows:  "Pl. Dep." refers to the transcript of plaintiff's deposition taken in this case on February 7, 2007, a complete copy of which is submitted as plaintiff's Exhibit 4 in opposition to the motion for summary judgment; "Compl." refers to plaintiff's complaint in this action; "Charge" refers to plaintiff's charge of discrimination filed with the Equal Employment Opportunity Commission (the "EEOC"), a copy of which is attached to the complaint; "Attach." refers to the "amended supplement" attached to the Charge; and "PX" and "DX," respectively, refer to plaintiff's exhibits and defendant's exhibits submitted in connection with this motion.

crack and division in the sidewalk," and injured his back and leg. (Id. at 27-28). He walked home and asked a friend to call Tourneau to tell his supervisors what happened and that he would not be coming to work. (Id. at 29-30; see Charge, Attach. ¶ 5).

That afternoon, McNamara drove himself to see his doctor, Dr. Steven Goldberg. (Pl. Dep. 29). Dr. Goldberg diagnosed McNamara with sciatica. (Id. at 30). McNamara was experiencing pain in his lower back. (Id.). He also eventually began feeling pain in his leg. (Id.). Prior to June 3, 2004, he had not experienced problems with his lower back or leg. (Id. at 30-31). Dr. Goldberg told McNamara that if he was not "totally better" within a week, he was to see an orthopedist. (Id. at 31).

After his doctor's visit on June 3, 2004, McNamara called Tourneau and reported that he had fallen and injured his back, he had visited his doctor, and the doctor had said that if he were not feeling substantially better within a week he was to see an orthopedic physician. (Id. at 45). At that point, McNamara was unable to work, with or without accommodation, and he did not, as far as he could recall, provide Tourneau with a doctor's note. (Id. at 46-47).

Between June 3 and June 10, 2004, McNamara did not speak again to anyone at Tourneau. (Id. at 48). He did not request any accommodation from Tourneau, nor did he tell anyone at Tourneau when he would be able to return to work. (Id. at 48-49). He did not see any doctors during that time. (Id. at 49).

- 3 -

By June 10th, although he was not ready to return to work, he felt that he could return to work with a few more days of rest. (Id. at 50, 56-57).  That day, he visited an orthopedist, Dr. Michael Errico, who also diagnosed plaintiff with sciatica. (Id.).  Dr. Errico filled out a form for McNamara, dated June 10, 2004 and addressed "To whom it may concern," that stated that McNamara "[w]as in the office today for an evaluation" and that:

> If Pt begins to experience pain intensifying
> he is to limit activity including standing
> and if persists is to leave work.

(PX 3).  The form had boxes to indicate whether the patient was totally or partially disabled, could not return to work, or could return to work with light or full duty, but none of these boxes was checked.  (Id.).  Finally, the form stated that McNamara would be "re-evaluated" on July 1, 2004.  (Id.).

### 3.   **McNamara Returns to Tourneau**

After seeing Dr. Errico, McNamara took the subway and a bus to the Tourneau store, where he met with a supervisor, Maria Ho.  (Pl. Dep. 50-51).  He gave Ho a copy of Dr. Errico's note and stated that he thought he would be able to return to work "in a few days."  (Id. at 51).  He volunteered to return the following Sunday, June 13th.  (Id. at 51, 54).  Ho called the store manager, Ammar Murad, who joined the meeting.  (Id.). McNamara gave him the same report, and Murad responded that he would have to speak to Tourneau's attorney before authorizing McNamara to return to work.  (Id. at 51-52).  McNamara did not

tell either Ho or Murad that he would need any kind of
accommodation to return.  (Id. at 54-55, 57).

On June 11th, McNamara spoke to Murad by telephone.
Murad said he had not been able to reach Tourneau's attorney, and
that he could not approve McNamara's return until he spoke to the
attorney.  He asked McNamara to call him the following Monday,
June 14th.  (Id. at 57).

On June 14th, McNamara called Murad, and Murad
authorized McNamara to return the next day.  (Id. at 58).  During
the conversation, McNamara did not request any accommodation upon
his return to work, but Murad offered to accommodate McNamara by
permitting him more opportunities to sit and rest than would
normally be allowed.  (Id. at 59-60; see Charge, Attach. ¶ 11).
The same day, McNamara faxed to Murad a copy of a note from Dr.
Goldberg dated June 10, 2004.  (Pl. Dep. 61; PX 2).  The note did
not address McNamara's ability to return to work, but merely
stated:

> Mr. McNamara suffered a fall on a cracked
> sidewalk and injured his back and his leg.
> He was given a prescription for Vioxx and was
> told to rest his leg and his back and to
> follow up with an orthopedic doctor.

(PX 2; see Pl. Dep. 62).  McNamara did not see Dr. Goldberg again
after the initial visit on June 3rd.  (Pl. Dep. 63).

McNamara returned to work at Tourneau on June 15th,
commuting by bus and subway.  (Id. at 63-64).  He had not asked
Tourneau for any accommodation prior to returning to work.  (Id.
at 63).  After setting up the display cases, he went to the men's

- 5 -

room and then his locker.  (Id. at 64-65).  As he returned to the
sales floor, he walked by the office of his sales manager, Ho,
and she asked him whether he had requested permission to leave
the floor.  (Id. at 65).  Fifteen minutes later, McNamara asked
Ho for a break; she said no, explaining that McNamara had just
had a break.  (Id. at 65-66).  McNamara did not tell her that he
needed a break because of his back, nor did he complain to anyone
at Tourneau that she had refused to let him take a break.  (Id.
at 66, 68).  Some twenty to thirty minutes later, Ho told
McNamara that he could take a break.  (Id.).  He was not refused
any other breaks nor did he ask for any other accommodation that
day.  (Id. at 68).

        The next day, June 16th, McNamara felt well enough to
return to work, and he did so.  (Id. at 68-69).  He asked for a
break in the morning and was granted one.  (Id. at 69-70).  In
the afternoon, he asked a supervisor, Cathy Prior, if he could
leave early.  (Id. at 70).  Prior gave him a "hard time" by
saying his leaving early was not fair to his colleagues because
they would be required to take on his work.  (Id.).  He
explained, however, that he needed to leave early because of his
back, and she agreed that he could leave early.  (Id. at 71).

  4.  **McNamara Is Unable To Work Again**

        On June 17th, McNamara called in sick again.  (Id. at
71-72).  He does not recall to whom he spoke at Tourneau, but his
back and leg pain were worse than they had been, and he explained
that he was unable to work because of the pain.  (Id. at 72, 73-

74).  From June 17th to June 20th, he was still unable to work, regardless of any accommodation.  (Id. at 75-76).  On June 20th, he spoke to Prior and explained that he did not feel well enough to return to work.  (Id. at 76).  He told her that he was going to see his doctor again, and he did not know when he would be able to return.  (Id. at 76-77).  McNamara did not request any accommodation from Tourneau, but merely told Prior that he would need to rest before returning to work.  (Id. at 77).

On June 21st, McNamara saw Dr. Errico again.  (Id. at 77-78).  Dr. Errico filled out a form, dated June 21, 2004, similar to the one he had filled out on June 10th.  (DX E; see PX 3).  The June 21st form stated that McNamara was being treated for sciatica and again none of the boxes regarding being disabled or returning to work was checked off.  (DX E).  Dr. Errico did not state in the note that McNamara could not return to work. Instead, he wrote only that McNamara had been in the office for an evaluation and was to limit the amount of standing for one to two weeks.  (Id.).  McNamara was to be re-evaluated on August 3, 2004.  (Id.).  Dr. Errico did prescribe a home exercise program, which included "Active Exercise," for six weeks.  (Id.).

After the visit, McNamara called Murad and told him that he needed to minimize the time on his feet for a minimum of one to two weeks.  (Pl. Dep. 78).  He faxed a copy of Dr. Errico's notes to Murad.  (Id.).  At that point, McNamara thought he would be unable to work for another week or two.  (Id. at 80-81).

5.   **McNamara Tries To Return to Work**

On June 25th, McNamara took the bus and subway to the
Tourneau store and spoke to Ho and Murad.  (Id. at 85-86).  He
told them he was experiencing too much pain to return to work at
that time.  (Id. at 86).  He told them that he thought he would
be able to return sometime before July 5, 2004, and he did not
request any accommodation or suggest that any accommodation would
enable him to return to work at that time.  (Id. at 86-87).
Murad said he would speak to Tourneau's attorney.  (Id. at 87).

The next day, June 26th, McNamara called Murad.  (Id.).
Murad told him that Tourneau's attorney had said that physical
therapy did not preclude McNamara from returning to work, and
Murad "demanded" that McNamara return to work the next day.  (Id.
at 88).  McNamara told Murad that it was not the physical therapy
that was preventing him from returning to work, but it was the
pain in his back and leg.  (Id. at 88-89).  Murad told McNamara
that if he did not return to work, Tourneau would treat McNamara
"like any other Tourneau employee that didn't come to work."
(Id. at 89).  McNamara interpreted this comment to mean that he
would be fired if he did not return to work.  (Id. at 67; see
Charge, Attach. ¶ 21).

On June 28th, McNamara returned to work, without having
made any attempt to call Dr. Errico or any other doctor.  (Pl.
Dep. 92-93).  The commute aggravated his back, however, and he
was unable to work.  (Id. at 104).  There was no accommodation
that would have enabled him to work, and he did not request any

accommodation other than asking for more time off.  (Id. at 106).
After fifteen minutes or so he left.  (Id. at 107).  He did not
go to see his doctor, and instead went to see his physical
therapist.  (Id.).  He did not tell anyone at Tourneau when he
would be able to return to work.  (Id.).

### 6.   McNamara Contacts the Commission, But Fails To Return To Work

After he left Tourneau on June 28th, McNamara did not
speak to anyone at Tourneau again until July 2nd, when he spoke
to Ho.  (Id. at 110).  That day, he contacted the Commission and
scheduled an appointment for July 20, 2004.  (Id. at 123).  He
called Ho afterwards "[j]ust to keep her informed."  (Id.).  He
told her that his condition was worsening and that he felt he
"was being harassed by Tourneau."  (Id. at 124).  Consequently,
he told her, he had contacted the Commission.  (Id.).  He hoped
that by telling her he had scheduled an appointment with the
Commission, Tourneau would stop "harassing" him.  (Id.).  He felt
that Tourneau was harassing him by "demanding that [he] return to
work prior to feeling well enough."  (Id.).  McNamara did not
tell Ho when he would be able to return to work, nor did he ask
her for any accommodation that would enable him to return to
work.  (Id. at 128).  McNamara did ask that he be permitted to
remain out of work until he felt well enough to return, but he
did not know when he would be able to return to work.  (Id. at
111-12).  Ho asked McNamara to speak to Tourneau's attorney,
Stuart Fisher.  (Id. at 133).

McNamara obtained no notes from any of his doctors after the June 21st note from Dr. Errico stating that he should limit the amount of standing for one to two weeks.  (<u>Id.</u> at 101-02, 113).  With the possible exception of calling Dr. Errico's office to move up his August appointment, McNamara did not call or see his doctors again prior to July 20th.  (<u>Id.</u> at 107-09, 125-27).

From July 2, 2004 through July 8, 2004, McNamara still was unable to return to work, with or without accommodation, (<u>Id.</u> at 132-33).  During that period, he did not speak with anyone at Tourneau, nor did he provide any additional doctors' notes, nor did he make any effort to obtain any additional doctors' notes.  (<u>Id.</u> at 133-35).  He still felt that he could not return to work, and he still did not know when he would be able to return to work.  (<u>Id.</u> at 135).

### 7.   Tourneau Asks McNamara To Return To Work or Provide Documentation of His Inability To Do So

On July 8th, McNamara called Ho to report that he had followed up with calls to Fisher, leaving him messages to the effect that he was experiencing increased pain and had scheduled an appointment with the Commission.  (<u>Id.</u> at 137).  McNamara wanted Fisher to stop "harassing" him, and contended that Fisher was harassing him by "[d]emanding" that he return to work. (<u>Id.</u>).  That evening, Fisher returned McNamara's phone call. (<u>Id.</u> at 141).  Fisher advised McNamara that his meeting with the Commission did not preclude him from returning to work.  (<u>Id.</u>).

McNamara told Fisher his meeting with the Commission was not the reason he had not returned to work; rather, he said, he had not returned to work because of his increased pain.  (Id. at 141-43). The conversation ended with Fisher stating that he would write McNamara a letter with instructions.  (Id. at 143).

On July 14th, Fisher faxed McNamara a letter dated July 13, 2004.  (Id. at 143-44, 148; DX F).  The letter stated that McNamara had submitted only two doctors' notes, one dated June 10, 2004 and the other June 21, 2004.  (DX F).  The letter noted that neither note stated that McNamara was unable to work, and that the June 21st note merely stated that McNamara was to limit the amount of his standing for one to two weeks.  (Id.).  The letter then stated:

> Tourneau is prepared to make every reasonable accommodation in accordance with your doctor's note.  This means that you can have a stool to rest on and will be allowed to take more frequent breaks than usually permitted.  However, nothing in your doctor's note or in the terms of your employment requires Tourneau to leave your attendance at work to your sole discretion, exercised on a moment by moment basis.  Again, we are prepared to make reasonable accommodations to your condition but, unless your doctor advises us otherwise, you are required to show up and, within the limits of those accommodations, perform your responsibilities.

(Id.).

The letter noted that because McNamara had been employed by Tourneau for less than a year, he was not entitled to a leave under the Family Medical Leave Act.  (Id.).  It also stated that Tourneau was "an equal employment opportunity

employer," and that "absolutely no employment consequence" would result from McNamara's "consulting" the Commission.  (Id.). Finally, the letter concluded by stating:

> Accordingly, upon your receipt of this letter, unless you either (i) report to work subject to the appropriate accommodations, or (ii) present a note from your doctor that indicates that you are unable to work . . . and need to go on disability leave, your failure to report to work will be considered job abandonment and you will be terminated as an employee of Tourneau.

(Id.).  McNamara understood that this meant he was either to report to work or provide a doctor's note stating that he was unable to do so.  (Pl. Dep. 152-53).  As of July 14th, McNamara still was unable to return to work, and he did not request any accommodation to enable him to return to work.  (Id. at 150).

After receiving the letter on July 14th, McNamara immediately telephoned Fisher.  (Id. at 153-54).  McNamara told Fisher that he was not returning to work because of the pain in his back and leg, not because he had made an appointment with the Commission.  (Id. at 154).  McNamara believed, at the conclusion of the conversation, that he had to return to work or otherwise get a doctor's note.  (Id. at 155-56).

### 8.   McNamara Does Not Return To Work Or Obtain Another Doctor's Note

That week, McNamara spoke to Dr. Errico's office; he did not initiate the call but the office called him because it had gotten a call from Fisher.  (Id. at 156).  McNamara asked to move up his appointment with Dr. Errico, but the appointment was not moved up.  (Id. at 156-57).  McNamara could not recall

whether he gave Dr. Errico's office any indication of why he needed to move his appointment up.  (Id. at 157).  He does not believe that Dr. Errico's office ever got back to him about moving up his appointment.  (Id. at 157-58).

McNamara did not make any other efforts to get another doctor's note; he contends that he did not have time to obtain another doctor's note.  (Id. at 125, 157, 169).  As of July 20th, McNamara had not gone back to see Dr. Errico, nor had he seen any other doctor, since his visit to Dr. Errico on June 20th, even though he remained out of work.  (Id. at 127, 164).

On July 19th, McNamara spoke to Ho.  (Id. at 164).  He told her that he was going to ask his doctor for a follow-up appointment.  (Id. at 172).  McNamara did not tell her when he would be returning to work, other than to say that he would let her know after he spoke with an orthopedist.  (Id.).  He did not ask her for any accommodation.  (Id. at 173).  Moreover, he had made no attempt to speak to Fisher since they last spoke on July 14th.  (Id. at 172-73).

### 9.  **McNamara Goes To the Commission**

On July 20th, McNamara met with the Commission.  (Id. at 173-74; PX 10).  McNamara believed the meeting was "very strange," and he had the "distinct impression" that the Commission favored Tourneau.  (Pl. Dep. 174).  Two representatives of the Commission, including a lawyer, met with him.  (PX 10).  The Commission decided not to accept McNamara's

complaint because it determined that McNamara "[f]ailed to state
a claim."  (PX 13).

      **10.  <u>Tourneau Fires McNamara</u>**

      In the afternoon on July 20th, after he returned home
from his visit to the Commission, McNamara received a letter from
Fisher, on behalf of Tourneau, by fax.  (Pl. Dep. 175; <u>see</u>
Charge, Attach. ¶ 34).  The fax, which is dated July 20, 2004,
stated:

> This letter is a follow up to my letter
> to you of July 13, 2004.  Please be advised
> that your employment with Tourneau is
> terminated on your receipt of this letter.

(DX H).

      At his deposition, McNamara contended that Tourneau
retaliated against him for going to the Commission by firing him.
(Pl. Dep. 184).  Yet, he testified as follows:

> Q.   Why do you believe Tourneau retaliated
> against you?
>
> A.   For going to the [Commission].
>
> Q.   And in what way did they retaliate
> against you for going to the [Commission]?
>
> A.   They fired me.
>
> Q.   And why do you believe that was in
> response to your going to the [Commission]?
>
> A.   <u>I don't really know.  I don't know why
> they did it.</u>
>
> Q.   . . . My question is: Why do you believe
> that that was the motivating factor on
> Tourneau's part for discharging you, the fact
> that you went to the [Commission]?

- 14 -

> A.   <u>You know, I don't even pretend to know
> the way they think, because of everything
> that's transpired.   I don't have a clue.</u>
>
> Q.   Let me ask it a different way.
>
>    What evidence do you have that the
> reason you were fired was because you went to
> the [Commission]?
>
> A.   Well, they fired me on the day that I
> had my meeting there.
>
> Q.   Other than that, do you have any other
> evidence that's the reason they fired you?
>
> A.   <u>No.</u>

(<u>Id.</u> at 184-85 (emphasis added)).

### 11.   <u>The Temporary Nature of Plaintiff's Injury</u>

At his deposition, McNamara acknowledged that he was unable to work because of his injury sustained on June 3, 2004, only until shortly after July 19, 2004.  (<u>Id.</u> at 23-24).  He believes that he was medically able to work, without accommodation, as of approximately that time.  (<u>Id.</u> at 24). Indeed, he "submitted medical information to the [New York State] Department [of Labor] wherein his physician indicated that [McNamara] was unable to work from June 3, 2004 through July 19, 2004 due to sciatica and back pain."  (PX 9 at 2; <u>see</u> Pl. Dep. 22-24).).  At his deposition, McNamara testified as follows:

> Q.   Were you able to return to full-time
>     work somewhere within a week or two of
>     that date [July 19, 2004]?
>
> A.   I would say yes.

(Pl. Dep. 27).  Hence, McNamara was unable to work from June 3, 2004 to one or two weeks after July 19, 2004 -- approximately eight weeks, at most.

- 15 -

### 12.  __Administrative Charges__

McNamara filed a verified complaint with the New York State Division of Human Rights on August 10, 2004.  (PX 8).

On April 25, 2005, McNamara filed a charge with the EEOC alleging that Tourneau (1) discriminated against him based on his disability, and (2) committed unlawful retaliation against him.  (Charge at 1).  The EEOC did not make a probable cause finding but issued McNamara a "right to sue" letter dated June 14, 2005 so that he could pursue the matter in federal court. (Compl. ¶ 12).

### B.  __Procedural History__

On September 6, 2005, McNamara commenced this action by filing a complaint alleging that Tourneau violated the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12112-12117. (Compl. at 1).[2]

On November 18, 2005, McNamara, acting pro se, and Tourneau's counsel attended a pre-trial conference before the Court.  Both McNamara and Tourneau agreed to participate in the Court's pro se mediation program.  On January 25, 2006, the

---

[2]      On the pro se complaint form, in addition to checking off the ADA, he also checked off Title VII of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, gender, religion, and national origin.  See 42 U.S.C. §§ 2000e-2000e-17.  He did not check off the Age Discrimination in Employment Act, 29 U.S.C. § 621.  (Compl. at 1).  In the body of the complaint, however, McNamara checked off only the "disability" category, leaving blank the boxes for race, color, gender/sex, religion, national origin, and age.  (Id. ¶ 7). Likewise, in his EEOC charge, he checked off only disability and retaliation, leaving the other categories blank.  Hence, McNamara is asserting only claims for disability discrimination and retaliation.

Court's <u>Pro Se</u> Office assigned an attorney to assist McNamara in the mediation.  On March 21, 2006, the parties attended the mediation with their respective counsel and agreed on the terms of a settlement.  They signed a stipulation of settlement, which provided for a formal settlement agreement to be drafted and executed.  Before the formal agreement was signed, however, McNamara changed his mind and refused to go forward with the settlement.  Tourneau thereafter moved to enforce the settlement.  On December 5, 2006, I issued a memorandum decision holding that the parties had entered into a binding agreement, but concluding that the agreement gave McNamara the right to revoke.  <u>See</u> <u>McNamara v. Tourneau, Inc.</u>, 464 F. Supp. 2d 232 (S.D.N.Y. 2006).

During these proceedings, McNamara twice moved for my recusal.  In orders dated May 26, 2006, and November 3, 2006, I denied the requests.  <u>See</u> <u>McNamara</u>, 464 F. Supp. 2d at 236 n.4.

The parties engaged in discovery.  This motion followed.

**DISCUSSION**

I discuss first the discrimination claim and then the retaliation claim.

**A.   Discrimination**

**1.   Applicable Law**

The ADA prohibits employment discrimination against individuals with disabilities, and provides that:

> [n]o [employer covered by the ADA] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job

- 17 -

> application procedures, the hiring,
> advancement, or discharge of employees,
> employee compensation, job training, and
> other terms, conditions, and privileges of
> employment.

42 U.S.C. § 12112(a).  The ADA's definition of "discrimination"
includes "not making reasonable accommodations to the known
physical or mental limitations of an otherwise qualified
individual with a disability who is an applicant or employee
unless . . . [the employer] can demonstrate that the
accommodation would impose an undue hardship on the operation of
[its] business."  Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1514
(2d Cir. 1995) (quotation omitted).

A plaintiff asserting a violation of the ADA must prove
that: (1) the defendant is covered by the ADA; (2) plaintiff
suffers from or is regarded as suffering from a disability within
the meaning of the ADA; (3) plaintiff was qualified to perform
the essential functions of the job, with or without reasonable
accommodation; and (4) plaintiff suffered an adverse employment
action because of his disability or perceived disability.  See
Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99 (2d Cir.
2003); Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir.
2001).

Under the ADA, a "disability" includes (1) a physical
or mental impairment that substantially limits a major life
activity; (2) a record of such an impairment; or (3) a perceived
impairment.  42 U.S.C. § 12102(2); see Capobianco v. City of New
York, 422 F.3d 47, 56 (2d Cir. 2005).  Not every physical or

- 18 -

mental impairment is considered substantially limiting; "to be
substantially limited in performing manual tasks, an individual
must have an impairment that prevents or severely restricts the
individual from doing activities that are of central importance
to most people's daily lives.  The impairment's impact must also
be permanent or long-term."  Toyota Motor Mfg., Ky., Inc. v.
Williams, 534 U.S. 184, 198 (2002) (emphasis added).  Temporary
conditions do not constitute disabilities under the ADA and other
statutes.  Id.; Adams v. Citizens Advice Bureau, 187 F.3d 315,
316-17 (2d Cir. 1999) (temporary neck, back, and knee injury
lasting three and a half months not a disability); Colwell v.
Suffolk County Police Dep't, 158 F.3d 635, 646 (2d Cir. 1998)
(temporary impairment of seven months not substantially
limiting); Williams v. Salvation Army, 108 F. Supp. 2d 303, 312-
13 (S.D.N.Y. 2000) ("temporary, non-chronic impairments of short
duration, with little or no long-term or permanent impact, are
usually not disabilities"); see Pimental v. Dartmouth-Hitchcock
Clinic, 236 F. Supp. 2d 177, 182 (D.N.H. 2002) (where employee
took eight-month medical leave for breast cancer surgery and
treatment, court dismissed claims because plaintiff's conditions
did not qualify as a disability under ADA).

     In Stronkowski v. St. Vincent's Medical Center, No. 94
CV 2175 (AHN), 1996 WL 684407, at *6 (D. Conn. Aug. 1, 1996), a
plaintiff who injured her back sued under the ADA.  The court
granted the employer's summary judgment motion in part because
plaintiff's "back condition was not of a particularly long

duration and [did] not appear to have had a permanent or long-term impact."

The existence of a disability is to be determined on a case-by-case basis.  Toyota, 534 U.S. at 185.

A person who has a disability covered by the ADA must prove that he can perform the essential functions of the job, with or without reasonable accommodation.  42 U.S.C. § 12111(8); see Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 135 (2d Cir. 1995).  An employee who is unable to work or who cannot show up for work, even with reasonable accommodation, cannot perform the essential functions of the job.  See, e.g., Porter v. N.Y. Univ. Sch. of Law, 99 Civ. 4693 (TPG), 2003 WL 22004841, at *11 (S.D.N.Y. Aug. 25, 2003) (plaintiff who was "unable to perform any work whatsoever" does not have a disability discrimination claim), aff'd, 392 F.3d 530 (2d Cir. 2004).

In some circumstances, a temporary inability to work may not be a bar to a disability claim; for example, an unpaid leave of absence can be a reasonable accommodation under the ADA, where "it is finite and will be reasonably likely to enable the employee to return to work."  Graves v. Finch Pruyn & Co., 457 F.3d 181, 185-86 & nn.5, 6  (2d Cir. 2006) (dicta); see, e.g., Humphrey v. Memorial Hosps. Ass'n, 239 F.3d 1128, 1136 (9th Cir. 2001); Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 649-50 (1st Cir. 2000).  On the other hand, "[i]ndefinite leave is not a reasonable accommodation."  Porter, 2003 WL 22004841, at *11; accord Guzman v. ARC XVI Inwood, Inc., No. 97 Civ. 0031

- 20 -

(THK), 1999 WL 178786, at *9 (S.D.N.Y. Mar. 30, 1999); see also Graves, 457 F.3d at 186 n.6 (reversing grant of summary judgment, but holding that on remand employer could move for summary judgment on basis that record contained "insufficient assurance of [plaintiff's] successful return to work").

Where a reasonable accommodation is needed, it is the employee's responsibility to request the accommodation and to inform the employer that an accommodation is needed.  Graves, 457 F.3d at 184-85.

### 2.   **Application**

Summary judgment is granted in favor of Tourneau on McNamara's discrimination claim because he has not submitted sufficient evidence from which a reasonable jury could find that: (a) he suffered from a "disability" within the meaning of the ADA, or (b) he was able to perform, even with reasonable accommodation, the essential functions of the job.

#### a.   **Existence of a "Disability"**

McNamara has presented evidence only to show that he suffered from a temporary impairment, an injury he sustained in a fall.  He has not presented evidence from which a reasonable jury could find a permanent or long-term impairment that substantially limited one or more major life activities.  Indeed, McNamara admitted at his deposition that his back and leg injury lasted only some eight weeks, following which he was able to return to work full-time.  (Pl. Dep. 22-24, 27).  This eight-week period is substantially shorter than other periods of temporary impairment

held to be insufficient for purposes of the disability laws. See, e.g., Adams, 187 F.3d at 316-17 (three and a half months); Colwell, 158 F.3d at 646 (seven months), Pimental, 236 F. Supp. 2d at 182 (eight months).

In addition, none of the medical evidence in the record suggests that McNamara was suffering from any kind of a long-term or permanent impairment; to the contrary, the last note -- Dr. Errico's June 21, 2004 note -- stated only that McNamara should limit the amount of his standing for one to two weeks.  (DX E). Hence, a reasonable jury could only find that McNamara was not an "individual with a disability" within the meaning of the ADA.

b.    **Ability To Perform Essential Functions**

Even assuming McNamara could show that he was an individual with a disability protected by the ADA, he has not presented evidence from which a reasonable jury could find that he was able to perform the essential functions of the job, even with reasonable accommodation.

First, for the period from June 3, 2004 until McNamara was discharged on July 20, 2004, it is undisputed that McNamara was unable to work at all, with the exception of the day and a half he worked on June 15th and 16th.  He acknowledged at his deposition repeatedly that otherwise during that time period he was unable to work because of the pain in his back and leg, and he acknowledged repeatedly that no accommodation would have enabled him to do his sales job at the Tourneau store.  Thus,

McNamara was unable to perform the essential functions of his job.

Second, although a temporary leave of absence, in some circumstances, can constitute a reasonable accommodation, McNamara did not ask for a temporary leave of absence. Rather, he asked for an indefinite one -- he wanted to be able to stay out of work until he decided he was able to return. But he did not provide Tourneau with any idea of when he expected he could return, and it was not reasonable for McNamara to expect Tourneau to hold his job open indefinitely, particularly as he had already been out of work some six weeks. An employer cannot reasonably be expected to hold a job open for an employee without some indication that the employee is likely to return and some idea of when that is likely to happen. See Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover, nor does it force an employer to investigate every aspect of an employee's condition before terminating him based on his inability to work."); Brown v. Pension Bds., 488 F. Supp. 2d 395, 407 (S.D.N.Y. 2007) (ADA does not require employer to give an employee "an open-ended, indefinite leave of absence with no guarantee that it would actually enable him to eventually return to work").

Third, even assuming an extended or indefinite leave of absence could be considered a reasonable accommodation, McNamara

did not provide Tourneau with adequate medical documentation to
show that such a leave was warranted.  His doctors' notes did not
say that he was disabled or unable to work.  Dr. Errico's June
21st note stated only that McNamara should limit his standing for
one to two weeks, which suggested that McNamara could return to
work right away, as long as he limited his standing.  When
McNamara continued to insist that he was unable to work, Tourneau
acted reasonably in asking him to submit additional documentation
to show that his continued absence from work was medically
justified.  Tourneau gave McNamara the opportunity to submit that
documentation, but he failed to do so.  See, e.g., Thompson v.
City of New York, No. 98 Civ. 5725 (GBD), 2002 WL 31760219, *8-9
(S.D.N.Y. Dec. 9, 2002) (plaintiff could not show employer failed
to accommodate where she did not provide necessary medical
documentation); accord Beck v. Univ. of Wis. Bd. of Regents, 75
F.3d 1130, 1137 (7th Cir. 1996) (employer not liable for failing
to reasonably accommodate where employee failed to furnish
necessary medical documentation).  Indeed, the only effort
McNamara made in this respect was to ask Dr. Errico's office --
when it telephoned him -- to move up his August appointment.  In
these indisputable circumstances, Tourneau could not properly
evaluate McNamara's request to be allowed to remain absent from
work indefinitely.

          Accordingly, McNamara's discrimination claim is
dismissed.

**B.**   **Retaliation**

   **1.**   **Applicable Law**

        Claims of retaliation under the ADA are analyzed under
the same framework employed in Title VII cases.  Treglia v. Town
of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); Lovejoy-Wilson v.
NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) ("We
analyze a retaliation claim under the ADA using the same
framework employed in Title VII cases.").

        To establish a prima facie case of retaliatory
discharge, a plaintiff must show that (1) he was engaged in a
protected activity; (2) the employer was aware of that activity;
(3) he was discharged; and (4) there was a causal connection
between the protected activity and the termination.  Treglia, 313
F.3d at 719; see Nakis v. Potter, 422 F. Supp. 2d 398, 418
(S.D.N.Y. 2006) (age discrimination).

        As to the fourth element, a plaintiff may present proof
of causation either "(1) indirectly, by showing that the
protected activity was followed closely by discriminatory
treatment, or . . . (2) directly, through evidence of retaliatory
animus directed against the plaintiff by the defendant."  Gordon
v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)
(Title VII); see also Cosgrove v. Sears, Roebuck & Co., 9 F.3d
1033, 1039 (2d Cir. 1993) (Title VII).  Close temporal proximity
can be enough to show causation, and the Second Circuit has held
sufficient a "mere twelve day" period between complaint and
discharge.  Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d

Cir. 1996).  On the other hand, close temporary proximity will not salvage a retaliation claim where the facts -- including, for example, where the adverse employment action is initiated before the protected activity occurs -- dispel any notion of retaliation.  See, e.g., Griffen v. Ambika Corp., 103 F. Supp. 2d 297, 312-13 (S.D.N.Y. 2006) (suspension two days after complaint to State Division of Human Rights insufficient to establish retaliation where steps toward discipline were taken before complaint); Zeigler v. Marriot Int'l, Inc., No. 03 Civ. 7688 (RWS), 2005 WL 1022431, at *15 (S.D.N.Y. May 2, 2005) (discipline one day after plaintiff filed discrimination charge insufficient where written warnings were issued prior to filing of charge and subsequent discipline was consistent with prior warnings); see also McLee v. Chrysler Corp., 109 F.3d 130, 136 (2d Cir. 1997) (discharge of plaintiff three days after supervisors learned plaintiff had contacted civil rights lawyer did not create issue of fact as to employer's motive, where plaintiff had been told earlier that he was going to be fired).

        Although the burden that a plaintiff must meet at the prima facie stage is de minimis, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer retaliatory intent.  See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995).

        Once a plaintiff establishes a prima facie case of retaliatory discharge, the burden shifts to the employer to

articulate a legitimate, non-retaliatory reason for its
employment decision.  Treglia, 313 F.3d at 721.  If the employer
makes this showing, the burden shifts back to the plaintiff to
prove that the employer's explanation is pretextual and that the
employer intentionally retaliated.  Id.

   2.  **Application**

        In light of the undisputed facts here, no reasonable
jury could find a causal connection between McNamara's visit to
the Commission and Tourneau's decision to discharge him.

        First, as McNamara acknowledged at his deposition, he
was told by Murad specifically on June 26, 2004 -- before
McNamara called the Commission or gave any indication that he had
done so or was going to do so -- that if he did not return to
work he would be fired, "like any other Tourneau employee" who
failed to report to work.  (Pl. Dep. 86-89).  McNamara understood
this to mean that Tourneau wanted him to report to work and that
he would be fired if he did not.  (Id. at 67).  Tourneau made
this clear to him before McNamara engaged in any protected
activity.

        Second, a reasonable jury could only find that McNamara
was using the Commission and the complaint process to try to
protect himself from being fired.  As he testified, he called the
Commission precisely because he felt harassed by Tourneau's
demand that he return to work.  (Id. at 123-24, 137).  While the
ADA and the other civil rights statutes prohibit discrimination
and retaliation, they do not provide a non-performing employee

- 27 -

with a guarantee of continued employment. Cf. Rizzo-Puccio v. College Auxiliary Servs., Inc., 71 F. Supp. 2d 47, 64 (S.D.N.Y. 1999) (plaintiff may not use employment statutes as shield to engage in misconduct), aff'd, 216 F.3d 1073 (2d Cir. 2000); Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 283 (S.D.N.Y. 1999) (rights afforded by ADA are a shield against employer retaliation, but may not be used as a sword to engage in misconduct), aff'd, 205 F.3d 1327 (2d Cir. 2000).

Third, Tourneau gave McNamara eminently reasonable instructions -- he was to return to work or he was to provide medical documentation that he was unable to do so. (DX F). McNamara understood that he was supposed to do one or the other or risk being fired. (Pl. Dep. 152-53). Yet, he did neither; he did not return to work and made no real effort to obtain additional documentation to show that he was unable to return to work. The fact that McNamara sought to file a complaint with the Commission did not relieve him of the obligation to either return to work or provide the additional medical documentation. Fisher's first letter was faxed to McNamara on July 14th and he essentially did nothing about it by July 20th; during that time he did not return to work and he did not provide any additional documentation. Tourneau was not required to delay taking action merely because McNamara was meeting with the Commission. Indeed, it appears that Tourneau proceeded without regard to what transpired at the Commission, as McNamara received the termination letter shortly after he returned home following his

meeting with the Commission. Given the sequence of events, it is not a reasonable inference that Tourneau fired McNamara for contacting the Commission. See McLee, 109 F.3d at 136.

Finally, McNamara's claim of retaliation is based on nothing other than the proximity of his discharge to his meeting with the Commission and his speculation. As he testified at his deposition, he did not really know why he believed Tourneau was retaliating against him; in fact, he conceded that he did not have "a clue." (Pl. Dep. 184-85). A motion for summary judgment may not be defeated by speculation and conclusory assertions.

## CONCLUSION

For the reasons set forth above, Tourneau's motion for summary judgment is granted and the complaint is dismissed, with prejudice and with costs. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

Dated:   New York, New York
         July 30, 2007

                                DENNY CHIN
                                United States District Judge

- 29 -